**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **LARRY ROSSER,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:06-CV-1127-O** |
| | § | |
| **RAYTHEON EXCESS PENSION PLAN,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

On April 18, 2008, the Court conducted a bench trial regarding the claims made by both

parties in this matter. After considering the evidence presented during trial, the parties' arguments,

post-trial proposed findings of fact and conclusions of law, and the relevant authorities, the Court

finds and concludes as set forth below.

**I. BACKGROUND**

Plaintiff, Larry Rosser ("Rosser"), was employed with Raytheon Company ("Raytheon")

from August 26, 1968 until December 31, 2004. (Ex. 1, Appx. 4). In 1999, Raytheon decided to

close its Strike Weapons Systems in Lewisville, Texas, and merge those operations with operations

in Tucson, Arizona. (Ex. 1, Appx. 8). Rosser's employment was affected by the closure of the

Lewisville plant. Raytheon created a Reduction-In-Workforce Benefits package that was distributed

to all employees. (Ex. 1, Appx. 118-122). Raytheon also provided all employees affected by the

Lewisville plant closing with a Job Release Date ("JRD"). Rosser's JRD was originally June 6,

2000, but he instead accepted a transfer to work at Raytheon's plant in Tucson, Arizona. Rosser's

JRD was therefore extended five times until he elected to retire on December 31, 2004. (Ex. 1,

Appx. 103-108).

At the time of his retirement, Rosser had been employed by Raytheon and its predecessor companies for 36 years and was eligible to receive a retirement package from the Raytheon Excess Pension Plan (the "plan"). (Ex. 1, Appx. 4). He was also eligible to receive Raytheon's employees' reduction-in-force benefits. (*Id*.). Rosser's reduction-in-force benefits entitled him to collect his salary for 60 days during a "Surplus period" and to collect a leave of absence (LOA) payment equal to one week's worth of salary for every year that he was employed. (*Id*. at Appx. 33). At his retirement, Rosser elected to receive his 60 day surplus payment of $25,846.40 and leave of absence payment of $116,308.80 in a single lump sum payment. (Ex. 1, Appx. 8).

At issue in this suit is whether Rosser's election to receive the 60 day surplus period payment in a lump sum at retirement, as opposed to its payment over a 60 day surplus period just prior to his retirement, is compensation or severance pay according to the terms of the plan. Both parties agree that compensation is used to calculate pension benefits and severance pay is not. (Plaintiff's Conclusions of Law ¶ 10; Ex. 1, Appx. 148). Both parties agree that payment of the 60 day surplus payment during the 60 day surplus period is compensation. (Plaintiff's Findings of Fact ¶ 2; Tr.[1] at 11-12). They disagree however over whether taking the payment as a lump sum amount at retirement as opposed to over a 60 day period prior to retirement transforms the payment from compensation to severance pay. (Tr. at 8; Defendant's Findings of Fact ¶ 9).

Rosser claims the 60-day surplus payment made to him was compensation and therefore should have been used to calculate his pension, regardless of the timing or the form of the payment.

---

[1] The Court refers to the "Trial Transcript" as "Tr. at" followed by the appropriate page number.

(Compl.[2] at ¶ 6; Tr. at 8). Raytheon contends that the payment for the 60-day surplus period was severance pay rather than compensation under the terms of the plan because it was paid in a lump sum upon Rosser's retirement from the company. (Defendant's Finding of Fact ¶ 9; Ex. 1, Appx. 148). Raytheon argues that the administrator's interpretation of this term was legally correct and was not an abuse of discretion. (Defendant's Conclusions of Law ¶ 5).

Rosser appealed the administrator's decision to a Benefits Appeals Committee (BAC) established by the plan. The BAC affirmed the administrator's decision.[3] (Ex. 1 at Appx. 11, 18-21, 148-149). Rosser then challenged the final administrative decision by filing suit in this Court.

In his complaint, Rosser alleges the administrator acted under a conflict of interest because Raytheon funded the plan and administered the plan through its employees. As a result, he contends Raytheon breached its contract by denying him the totality of his benefits under the plan. (Compl. at ¶ 15-19). Rosser also seeks recovery of his attorneys fees. (Compl. at ¶¶ 20-21).

Raytheon denied that it wrongfully breached the contract and affirmatively claimed that Rosser waived any right he had to contest the administrator's decision. (Answer at ¶ 24-27). Raytheon also asserted by counterclaim that it was entitled to recover from Rosser all benefits it paid to him. (Answer ¶ 28-32). In accordance with the requirements of Rule 52 of the Federal Rules of

---

[2] The Court refers to "Plaintiff's First Complaint" as "Compl. at" followed by the appropriate paragraph number or page number. For clarity, the Court notes that while Plaintiff was granted leave to file a First Amended Complaint, Doc. No. 55 (3:06-CV-1127-O) (N.D. Tex. Mar. 25, 2008), the Court subsequently struck the amended complaint due to Plaintiff's failure to comply with the court's order. Doc. No. 62 (3:06-CV-1127-O) (N.D. Tex. Apr. 17, 2008). Accordingly, trial proceeded on the claims as alleged in Plaintiff's first complaint filed June 26, 2006.

[3] Both parties agree that it is the BAC's decision affirming the administrator's conclusion that is at issue in this case. (Compl. at ¶ 6; Defendant's Conclusion of Law ¶ 5). Because much of the case law relevant to the issues in this case refers to whether the administrator did or did not abuse his discretion, references to the administrator throughout this document refers to the BAC's decision.

Civil Procedure, the Court now examines the applicable law and sets out its findings of fact and conclusions of law.

## II. FINDINGS OF FACT

1. The Excess Pension Plan at issue in this lawsuit is an unfunded, nonqualified plan of deferred compensation that is established and operated in accordance with the Employee Retirement Income Security Act of 1974, as amended (ERISA). (Ex. 5, Appx. 2, ¶ 4).

2. Raytheon Company funded the Excess Pension Plan and its officers or their delegates were the Plan Administrator. (Ex. 1, Appx. 140).

3. The Excess Pension Plan grants to the Plan Administrator the discretion to find facts and interpret the Plan. (*Id.* at Appx. 158-159 (Article V, §5.2)).

4. Raytheon designated a Benefits Appeals Committee (BAC), consisting of Raytheon employees, to hear appeals of denials of claims for benefits under the Excess Pension Plan. (Ex. 5, at Appx. 2 ¶ 4; Defendant's Finding of Fact ¶ 5).

5. At the time of his retirement, Rosser worked for Raytheon. (Ex. 1, Appx. 4).

6. Raytheon enacted a reduction in force plan for certain of its employees whose job was eliminated when Raytheon closed facilities where they were assigned. (Ex. 5, Appx. 2, ¶ 4 and Ex. 1, Appx. 93).

7. Raytheon established JRD's for each of the employees affected by the closing and who were entitled to reduction in force benefits. (Ex. 1, Appx. 93).

8. Rosser's JRD was extended from 2000 to 2004. (Ex. 1, Appx. 24).

9. Rosser retired from Raytheon on December 31, 2004. (Ex. 1, Appx. 4).

10. At the time of his retirement, Rosser was eligible to receive reduction in force pay consisting

of pay and benefits for a 60 day surplus period as well as LOA pay equal to one weeks pay for each year of service. He also had the option to take these sums in a single lump sum payment if he retired or terminated his employment with Raytheon. (Ex. 1, Appx. 93).

11. At the time of his retirement, Rosser elected to take a single lump sum payment of $142,155.20 which consisted of the 60-day surplus benefit of $25,846.40 and the LOA benefit of $116,308.80. (Ex. 1, Appx. 8).

12. Under the Excess Pension Plan, pension eligible compensation includes total earnings but excludes severance pay. (Ex. 1, Appx. 87-88, 133-134).

13. The Plan Administrator determined that Rosser's 60 day surplus payment was not compensation and therefore was not pension eligible because he retired and never entered the 60 day surplus period. (Ex. 1, Appx. 6 and Appx. 11).

14. Rosser appealed this decision and the BAC affirmed the Plan Administrator's decision. (*Id.*)

15. Rosser filed this suit challenging this BAC decision. (*See generally* Compl.)

16. Exhibit 1 contains the administrative record related to Rosser's claim.

17. The Waiver and Release Agreement insulates Raytheon "from any claims of any nature . . . from [Rosser's] employment or termination of employment." (Ex. 3, Appx. 143).

18. Rosser's lawsuit involves claims for benefits arising from his termination of employment. (*see generally* Compl.).

19. Under the waiver and release agreement, Rosser agreed that "as a condition precedent to maintaining litigation, [he would] immediately reimburse RTIS those special benefits described in the first paragraph of this Agreement and described in the attached Schedule." (Ex. 3, Appx. 143).

20. Rosser has not returned the benefits. (Amended Joint Pretrial Order at 4).

21. The amount of benefits received by Rosser for signing the Waiver and Release agreement was $142,155.20. (*Id.*).

22. Under the waiver and release agreement, Rosser agreed that if he filed a lawsuit, he would "pay for all costs incurred by RTIS, any related companies or the directors or employees of any of them, including reasonable attorney's fees, in defending my claim." (Ex. 3, Appx. 143).

23. Raytheon's attorney's fees are reasonable and necessary.

24. A conclusion of law that should be treated as a finding of fact is hereby adopted as such, and a finding of fact that should be treated as a conclusion of law is hereby adopted as such.

## III.  CONCLUSIONS OF LAW

### A.    ERISA claim

Because the plan grants the administrator discretion to construe the terms of the plan, the Court's duty is to determine whether he abused that discretion. *Dowden v. Blue Cross Blue Shield,* 126 F. 3d 641 (5th Cir. 1997); *see also* Ex. 1, Appx. 158-159 (". . . the Plan Administrator shall have full discretionary authority to determine eligibility for benefits and to construe the terms of the Plan, including questions of fact and law. In addition, the decisions made by and the actions taken by the Plan Administrator in the administration of the Plan shall be final and conclusive on all persons, and the Plan Administrator shall not be subject to liability whatsoever with respect to the administration of the Plan"). Rosser bears the burden to show that the administrator abused his discretion. *Dowden*, 126 F. 3d at 644. This requires the Court to determine whether the administrator's decision

was reasonable. *MacLachlan v. ExxonMobil*, 350 F.3d 472 (5th Cir. 2003). The administrator's decision will be found reasonable if there is a rational connection between known facts and the decision or found facts and the evidence. *Meditrus Financial Services Corp. v. Sterling Chemicals, Inc.*, 168 F.3d 211 (5th Cir. 1999).

Rosser's allegation that the administrator has a conflict of interest is one factor to consider when evaluating whether he abused his discretion. *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008). To show an abuse of discretion, evidence outside of the administrative record may be admitted to show how an administrator has interpreted the terms of the plan in other instances. *Estate of Larry Bratton v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 215 F. 3d 516, 521 (5th Cir. 2000).

To decide if the administrator abused his discretion, the Court employs a two step process established in *Wildbur v. ARCO Chemical Co.*, 974 F.2d 631 (5th Cir. 1992). *See High v. E-Systems Inc.*, 459 F.3d 573, 577 n.2 (5th Cir. 2006). The first step of the *Wildbur* test is to determine whether the administrator employed the legally correct interpretation of the plan ("Wildbur Step 1"). *Id.* If the Court finds the administrator did not employ the legally correct interpretation, the Court must then determine whether the administrator abused his discretion in varying from the correct interpretation ("Wildbur Step 2"). *Id.*

To determine if the administrator's interpretation of the plan was legally correct under Wildbur Step 1, the Court evaluates whether the administrator has (1) given the plan a uniform construction; (2) whether the interpretation is consistent with a fair reading of the plan; and (3) whether there are any unanticipated costs resulting from different interpretations. *Wildbur*, 974 F.2d at 638. When deciding if the administrator abused his discretion under Wildbur Step 2, the Court

considers (1) the internal consistency of the plan under the administrator's interpretation; (2) relevant regulations; (3) the factual background surrounding the determination; and (4) any inferences of lack of good faith. *Id.* If the Court determines that the administrator did not abuse his discretion, there is no need to decide whether he correctly interpreted the plan under Wildbur Step 1. *High*, 459 F.3d at 577. When the plan grants the administrator the authority to interpret the plan, he is also empowered to resolve ambiguities contained within the plan. *See High*, 459 F.3d at 579.

The dispute in this case centers on how the plan treats Rosser's 60 day surplus payment. If this payment is compensation under the plan, then the payment is pensionable. If it is not, then the payment was properly excluded from Rosser's pension calculation. Compensation is expressly defined in the plan as follows:

1.6-E <u>Compensation</u>:

    (a)    The total earnings paid by a Participating Employer to a Participant during the year including but not limited to:

- base pay,
- overtime pay,
- sales bonuses,
- performances premiums,
- premiums paid in addition to base salary to compensate for hazardous duty, hardship, inconvenience or other unusual job factors, and incentive awards;

but excluding:

- severance pay, ….

(Ex.1, Appx 133-134). While compensation is specifically defined under the plan, severance pay is not. In general, severance pay is defined as "[p]ayment by an employer to employee beyond his wages on termination of his employment. . . . Generally, it is paid when the termination is not due to employee's fault and many union contracts provide for it." BLACK'S LAW DICTIONARY 1232 (5th

ed. 1979). The administrator determined Rosser's 60 day surplus payment was severance pay because he found it was not one of the items specifically enumerated in the plan's definition of compensation. (Ex. 1, Appx. 96) ("Lump sum payment in lieu of 60 days salary does not constitute any of these items."). Whether this interpretation was an abuse of discretion is dispositive of Rosser's claim.

### 1. Rosser's Arguments in light of Wildbur Step 1 Factors

#### a. *Uniform Construction*

Rosser argues that the administrator has not provided a uniform construction between the 60 day surplus payment and the definition of compensation. For support, Rosser points to statements in the record of various Raytheon employees. Mike Tinker, a former Raytheon Human Resource Director, wrote the administrator concerning Rosser's claim and asserted that Rosser's 60 day surplus payment was pension eligible. (Ex. 1, Appx. 97). Mr. Tinker wrote that Raytheon's benefits program provided that the payment during the "1-60 day Surplus period" would be eligible income for retirement calculations. (*Id.*). Mr. Tinker's assertion was corroborated by Ken Pederson, a Raytheon Vice President, who worked to extend Rosser's JRD as well as Leon Ferguson, a Raytheon Senior Human Resources Specialist. (Ex. 1, Appx. 109-110) (Mr. Pederson wrote: "Mike Tinker's Memorandum ... correctly summarizes the pertinent parts of [Rosser's] benefits and the surrounding circumstances ... and they should not be reinterpreted at this time." Mr. Ferguson wrote: "I would like to reference the statement and material provided by Mr. Tinker, and completely concur with Mr. Tinker's response."). Collectively, these are referred to as the Tinker documents. Based on these statements, Rosser contends the administrator has not provided a uniform construction of the plan's terms.

### b. *Fair Reading of the Plan*

Rosser also claims that the administrator's interpretation is not consistent with a fair reading of the plan. He argues that the explanatory documents Raytheon provided to its employees distinguish between Raytheon's exclusion of LOA payments for pension purposes and its inclusion of the 60 day surplus payment when calculating a pension. (Ex. 1, Appx. 79, 80, 82-83, 95). Based on these documents, Rosser argues that the 60 day surplus payment must be pensionable. Additionally, Rosser argues that the plan language itself defines compensation as "total earnings." Since Raytheon paid him the 60 day surplus payment because of his employment with Raytheon, Rosser believes that payment was earnings. Based on Raytheon's documents explaining pension eligibility combined with the plan's broad definition of compensation, Rosser believes the only fair reading of the plan language would be to characterize the 60 day surplus payment as compensation.

### c. *Unanticipated Costs*

Rosser provides no extrinsic evidence, citation to the record, or discussion of unanticipated costs that may result from different interpretations of the plan. But on balance, Rosser believes the administrator did not correctly apply the definition of compensation to the 60 day surplus payment in this case.

### 2. <u>Rosser's Arguments in light of Wildbur Step 2 Factors</u>

Turning to the second *Wildbur* step, Rosser contends the administrator abused his discretion. He argues the administrator has not applied the terms consistently as evidenced by the Tinker documents. As with the unanticipated cost factor, Rosser provides no discussion of relevant regulations. The record contains background information surrounding Rosser's decision to extend his JRD and to ultimately retire from Raytheon. He contends this evidence indicates that Raytheon

did not act in good faith because he was told that his JRD extensions would not change his benefits. (Ex. 1, Appx. 109) (Mr. Pederson wrote: "Through the JRD extensions, Raytheon contracted to Larry Rosser the same benefits as if he had seperated in 2000"). Balancing all of the Wildbur Step 2 factors, Rosser contends the administrator abused his discretion.

### 3.  Raytheon's Defense

In response, Raytheon argues that by taking the 60 day surplus payment in a lump sum at his retirement, instead of continuing his employment and receiving the payment over a 60 day period, the administrator properly characterized the payment as severance pay and, even if he did not properly characterize it, the administrator did not abuse his discretion.

### 4.  Court's Conclusions

After considering the evidence, the Court concludes that Rosser failed to meet his burden to prove the administrator incorrectly interpreted the plan terms or that the administrator abused his discretion.

#### a.  Correct Legal Interpretation

##### (1)  *Uniform Construction*

The evidence in this case supports the conclusion that the administrator has given these terms a uniform construction. The administrator determined that Rosser's 60 day surplus payment was severance pay because Rosser terminated his employment before entering the surplus period. This is consistent with Raytheon's overall position according to the evidence in the record. Raytheon literature provided that employees eligible for employment <u>during</u> the 60 day surplus period would receive full pay and benefits. (Ex. 1, Appx. 95). Raytheon literature also explained that employees who continued with Raytheon <u>during</u> the surplus period would receive normal paychecks during the

60 day period. (Ex. 1, Appx. 64). Rosser acknowledged during his appeals process that by taking his 60-day surplus payment in a lump sum at his retirement he "gave up the opportunity to remain an employee of Raytheon, with associated benefits, for the combined length of time of the 60-day Surplus period ...." (Ex. 1, Appx. 90). Earnings and time attributable towards pension calculations are valuable benefits associated with employment. He acknowledged he was giving up these types of benefits by leaving Raytheon before entering the 60 day surplus period. Since Rosser retired and never entered the 60 day surplus period, the 60 day surplus payment made as a lump sum upon his retirement is distinct from its payment during a 60 day surplus period. Construing Rosser's 60 day surplus payment as the administrator has is consistent with Raytheon's overall approach to these payments.

While Rosser claims that the Tinker documents provide evidence that the administrator has not provided a uniform construction of the 60 day surplus payment, he failed to show that the instances Tinker references were similar to Rosser's fact situation. The Tinker documents do not discuss, and Rosser does not provide evidence to show, whether Tinker refers to instances where a retiree took the 60 day surplus payment as a lump sum at his retirement as opposed to it being paid throughout the 60 day surplus period. In other words, missing from Rosser's proof is whether the prior instances Tinker referenced were of employees who accepted the 60 day surplus payment and remained employed during the 60 day period; whether the prior instances were to employees who remained employed during the 60 day period and retired at its conclusion even though they had no obligation to actually appear at their duty station during that period; or whether those prior instances were similar to Rosser's, that is they retired immediately, received the 60 day surplus payment in a lump sum, and that sum was used to calculate their pension.

Proving that the prior instances Tinker referenced were similar to Rosser's circumstances is critical to Rosser's contention that there has been no uniform construction of the plan under Wildbur Step 1 and that the administrator has inconsistently interpreted the plan under Wildbur Step 2. If they are not factually similar, they do not demonstrate that the administrator's construction or interpretation of the plan has been varied or inconsistent. To make this showing, Rosser was obliged to prove the similarities between his circumstances and the others. His failure to do so diminishes the weight given to his claims that the administrator has not provided a uniform construction of, or inconsistently applied, the plan terms.

### (2) *Fair Reading*

Rosser's argument that the administrator did not give the plan a fair reading is also unpersuasive. He has failed to show the administrator unfairly read and applied the terms compensation and severance pay to his circumstances. Severance pay is payment beyond wages made upon an employee's termination. Rosser was paid the 60 day surplus payment when he retired from the company. (Ex. 1, Appx. 4). Therefore, his 60 day period never began. (Ex. 1, Appx. 118) ("[w]hen you reach your Job Release Date, you begin Surplus status"). Since he did not work in the 60 day surplus period, his 60 day surplus payment was payment beyond his wages made at his termination.

Further, the plan's definition of "compensation" is written to capture payments for earnings. Generally, earnings refer to payment for labor or services. *See* BLACKS LAW DICTIONARY 456 (5th ed. 1979)(earnings defined in part as "money earned from performance of labor, services, sale of good, etc."). Since Rosser did not work during the 60 day period, it was not unreasonable for the administrator to conclude that the 60 day surplus payment was not earnings and therefore was not

compensation under the plan.

Even the Tinker letter supports the administrator's conclusion. His letter refers to Raytheon literature 5Q81 (an apparent reference to 5Q81 at Ex. 1, Appx. 82-83) as a basis for his conclusion that the administrator did not correctly apply the plan's definition to Rosser's 60 day surplus payment. Section 5Q81 provides that earnings "through the end of" the 60 day period are included in the pension calculation. (Ex. 1, Appx. 82). Rather than bolstering Rosser's contention, this statement supports the administrator's reading that the 60 day surplus payment is pensionable only if the employee is employed <u>through</u> the 60 day period.

The propriety of the administrator's determination is reinforced when viewed in light of his authority to construe the terms of the plan. The plan grants the administrator authority to construe these terms. (Ex. 1, Appx. 158-159). His decision is final and conclusive. *Id*. Even if the terms compensation and severance pay are ambiguous as applied to this case, the administrator is empowered to resolve this ambiguity. *High*, 459 F.3d at 579. The administrator's determination that Rosser's 60 day surplus payment did not meet any of the enumerated terms in the definition of compensation and thus, the payment must be severance pay is not unreasonable given his authority to construe these terms.

### (3) *Unanticipated Costs*

Rosser has provided no evidence or discussion as to how this factor impacts his claim. Based on the foregoing, the Court concludes Rosser failed to prove the administrator incorrectly interpreted the plan terms with respect to his 60 day surplus payment.

### b. Abuse of Discretion

The Court also concludes Rosser has not carried his burden to show there was an abuse of discretion under Wildbur Step 2. Rosser's contention that there have been internal inconsistencies with the administrator's interpretation of these terms is based on the Tinker documents. For the reasons discussed above, the Tinker documents are insufficient to show there have been internal inconsistent interpretations of the plan. And despite the opportunity to do so, Rosser failed to present extrinsic evidence to show the factual similarities between those instances Tinker referenced and Rosser's fact situation. Additionally, Rosser does not cite to any regulations that would be relevant to this issue.

Rosser does provide background information regarding Raytheon's need for his skills at another corporate location and Raytheon's efforts to persuade him to extend his JRD. This evidence includes Raytheon's promise that his benefits would remain the same even if he extended his JRD. (Ex. 1, Appx. 109-110). Rosser contends these facts show Raytheon acted in bad faith when it construed his 60 day surplus payment as severance pay because, he argues, had he not extended his JRD his 60 day surplus payment would have been used to calculate his pension. But this argument misses the distinction between remaining employed during the 60 day surplus period and retiring before entering the surplus period. There is no evidence to suggest that anyone at Raytheon promised that Rosser's 60 day surplus payment would be pensionable even if he ceased employment before the surplus period at his initial JRD in 2000. Rosser's support for this contention in the record before the Court is the Tinker documents. But as discussed above, those documents do not distinguish between an immediate retirement and one after the 60 day surplus period. Therefore, they are insufficient to make this showing. If Raytheon made this promise to Rosser, he failed to

present sufficient evidence to establish it.

In short, nothing Rosser presented demonstrates the administrator acted in bad faith when construing Rosser's 60 day surplus payment. Even considering Raytheon's conflict of interest, Rosser has not shown the administrator abused his discretion when interpreting these terms.

## B.      Counterclaim

Raytheon pleaded a counterclaim for breach of the waiver and release agreement. At trial, Raytheon relied on exhibits 3, 6, and 8, which were admitted without objection, in support of its claim. (Tr. 24-25). Raytheon contends that Rosser signed a valid waiver and release agreement agreeing to release all "claims of any nature" that he may have "from his employment or termination of employment with [Raytheon TI Systems]" and that he would never file a lawsuit based on released claims. (Ex. 3). Raytheon argues Rosser has breached the agreement by filing the instant lawsuit, and that it is entitled to recover all benefits mentioned in the agreement as well as attorney's fees and cost incurred in the defense of this case. (Answer at 5). Rosser counters that the waiver and release agreement does not apply to ERISA claims. (Tr. at 27; Plaintiff's Findings of Fact at p. 4).

### 1.      Actual Damages

Federal courts have held that ERISA claims may be waived by agreement, but such waiver and release must be knowing and voluntary. *Madrid v. Phelps Dodge Corp.*, 211 Fed. Appx. 676, 679 (10th Cir. 2006) (holding that plaintiff knowingly and voluntarily waived ERISA and Title VII claims). The interpretation and validity of a waiver and release of claims under ERISA is governed by federal law. *Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 935 (5th Cir. 1994). A release does not need to expressly mention ERISA claims in order to validly waive such claims. *Chaplin*

*v. Nationscredit Corp.*, 307 F.3d 368, 373 (5th Cir. 2002).

To determine whether a release was knowingly and voluntarily executed, the Fifth Circuit employs a "totality of the circumstances" test. *See O'Hare v. Global Natural Res.*, 898 F.2d 1015, 1017 (5th Cir. 1990) (applying the totality of the circumstances test to determine validity of a waiver of rights under ADEA). Under this test, the employer carries the burden to prove that the employee (1) signed the release that addresses the claims at issue, (2) received adequate consideration, and (3) breached the release. *Chaplin*, 307 F.3d at 372 (citing *Williams*, 23 F.3d at 935). The employee must then come forward with evidence showing that "the release is invalid because of fraud, duress, material mistake or some other defense." *Id.* To determine whether the employee has met its burden of establishing a defense to the validity of the release, a district court reviews the following relevant factors:

1.     the plaintiff's education and business experience,
2.     the amount of time the plaintiff had possession of or access to the agreement before signing it,
3.     the role of the plaintiff in deciding the terms of the agreement,
4.     the clarity of the agreement,
5.     whether the plaintiff was represented by or consulted with an attorney, and
6.     whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled to by contract or law.

*O'Hare*, 898 F.2d at 1017.

Here, the parties have stipulated that Larry Rosser signed a Waiver and Release Agreement, and that he received $142,155.20 as consideration for signing the agreement. *See Joint Pretrial Order* at 2-3. The parties further stipulate that Larry Rosser did not return the consideration received for signing the agreement. *Id.* This agreement contains language stating:

I hereby voluntarily and knowingly release RTIS and its subsidiaries, officers, employees, and agents from *any claims of any nature whether now known or later*

17

*becoming known from my employment or termination of employment with RTIS*, including without limitation, any violation of any federal or state law, common law, court decision, ruling or regulation prohibiting, or creating a cause of action for, termination of employment or discrimination in employment on the basis of age, sex, race or otherwise. This release also applies to any claims brought by any person or agency or any class under which I may have any right or derive any benefit.

\* \* \*

Should I breach my promise set forth in this agreement and file a lawsuit or accept recoveries or benefits based on claims that I have released, as a condition precedent to maintaining litigation, I will immediately reimburse RTIS those special benefits described in the first paragraph of this Agreement and described in the attached Schedule.

(Ex. 3, Appx. 143-144) (emphasis added). In *Chaplin*, the Fifth Circuit reviewed a similar agreement to determine whether it waived plaintiff's claims under ERISA. The language in that release stated:

You hereby agree to release NCDF from *any and all claims, suits, demands, or other causes of action of any kind . . . arising at any time in the unlimited past up to and including the date of your execution of this Letter of Agreement.* This release includes any claims based in tort, contract or alleged violation of any federal, state, or municipal statute, or ordinance. It includes, but is not limited to, all claims arising by reason of or in any way connect with your employment relationship with NCDF . . .

307 F.3d at 370 (emphasis added). The Fifth Circuit found that the language was unambiguous and evinced an intent to release "every imaginable cause of action." *Id.* at 372. The circuit court ultimately held:

a general release of "any and all" claims applies to all possible causes of action, unless a statute specifically and expressly requires a release to mention the statute for the release to bar a cause of action under the statute. ERISA contains no such requirements. The releases therefore cover plaintiff's claims for ERISA benefits.

*Chaplin*, 307 F.3d at 373. Given factual similarity between the release language in *Chaplin* and this case, the Court concludes that the waiver and release agreement signed by Rosser covers his ERISA claim. Based on the stipulations, Raytheon has carried its burden to prove that Rosser signed the

agreement, received adequate consideration, and breached the agreement by filing suit without reimbursing Raytheon for the benefits received under the agreement.

At trial, Rosser failed to bring forth any evidence to show the release was invalid because of fraud, duress, material mistake, or another defense. Instead, Rosser relied on simply his own interpretation of the agreement and argued that it could not and did not cover an ERISA claim. (Tr. at 27). Having found that the Fifth Circuit has construed a similar waiver and release agreement and held it waived plaintiff's ERISA claims, the Court finds Rosser's arguments are unpersuasive and contrary to established precedent. Accordingly, the Court concludes that Rosser breached the terms of the waiver and release agreement. Raytheon is entitled to actual damages in the amount of $142,155.20, which represents the amount of special benefits Rosser received in consideration of his waiver and release. (Ex. 3).

## 2. Attorney's Fees

Having prevailed on its breach of contract claim, Raytheon is entitled to recover its reasonable attorney's fees. TEX. CIV. PRAC. & REM. CODE § 38.001; *see also Coffel v. Stryker Corp.*, 284 F.3d 625, 640 (5th Cir. 2002) ("The award of reasonable attorneys' fees is mandatory under §38.001 if the plaintiff prevails in his or her breach of contract claim and recovers damages.") (citation omitted)). The parties stipulated to the admissibility of each other's redacted time sheets or fee statements. (Am. Joint Pretrial Order at 4). In support of its claim for attorney's fees, Raytheon introduced the affidavit of its counsel, David Denny, summarizing the number of hours expended, the hourly billing rate, and attached redacted billing records that reflect the legal work performed. (Ex. 6, 8). The Court finds this evidence is sufficient to show the attorney's fees requested are reasonable and necessary. *Coffel*, 284 F.3d at 641 (holding a district court has

discretion to determine the appropriate amount of attorney's fees). The Court concludes Raytheon is entitled to an award of attorney's fees in the amount of $5,692.50.[4]

## IV. CONCLUSION

In sum, the Court finds that Plaintiff failed to sustain its burden to prove liability for its claims as pleaded in the complaint. Accordingly, Plaintiff's claims against Defendant are DISMISSED with prejudice.

Further, the Court finds that Defendant established Plaintiff's liability on its counterclaim for breach of contract. Accordingly, Defendant is entitled to recover $142,155.20 in actual damages, and $5692.50 in attorney's fees. The Court will issue judgment accordingly.

**SO ORDERED** on this 4th day of November, 2008.

_____
**Reed O'Connor**
**UNITED STATES DISTRICT JUDGE**

---

[4] The Court notes that Raytheon also requests a prospective award of reasonable attorney's fees in the event that an appeal is filed in the Fifth Circuit, and if a further appeal is filed in the United States Supreme Court. (Ex. 8). Unlike state courts who are allowed to prospectively award attorney's fees, the customary practice in federal court is to deny such request without prejudice to a subsequent application based on fees that were actually incurred. *See e.g. Nat'l Satellite Sports, Inc. v. Garcia*, 2003 WL 21448375, at *3 (N.D. Tex. June 18, 2003). Accordingly, the Court concludes that Raytheon should not be awarded prospective attorney's fees at this time.